J-S65005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CRAIG EUGENE MOSS | : | |
| | : | |
| Appellant | : | No. 1533 MDA 2018 |

Appeal from the Judgment of Sentence Entered April 9, 2018
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0001471-2017

BEFORE: PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.: **FILED FEBRUARY 10, 2020**

Appellant, Craig Eugene Moss, appeals, *pro se*, from the judgment of sentence entered on April 9, 2018,[1] of one year less one day to two years less one day of imprisonment, in the Court of Common Pleas of York County, following his conviction of one count each of possession of an instrument of crime (PIC) and simple assault, and two counts of harassment.[2] On appeal, Appellant raises nine issues, claiming: (1) the Commonwealth failed to

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although Appellant purports to appeal from the order denying his post-sentence motions, an appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions. ***See Commonwealth v. Dreves***, 839 A.2d 1122, 1125 n. 1 (Pa. Super. 2003) (*en banc*). We have corrected the caption accordingly.

[2] 18 Pa.C.S.A. §§ 907(a), 2701(a)(3), 2709(a)(1).

disprove his claim of self-defense; (2) the evidence was insufficient to sustain his conviction; (3) the Commonwealth violated his constitutional rights when it used evidence at trial not stated in the indictment or bill of particulars; (4) the trial court deprived him of his right to self-representation; (5) the trial court erred when it sustained the Commonwealth's objection to a question asked during the cross-examination of witness Breanne Spangler; (6) the Commonwealth wrongly destroyed evidence; (7) the trial court erred in holding Appellant could not raise claims of ineffective assistance of counsel on direct appeal; (8) the trial court erred in denying Appellant's motion for an expert witness; (9) the trial court erred in denying Appellant's speedy trial motion. Appellant's Brief, at 2-3. After review, we affirm.[3]

As we write primarily for the parties, a detailed factual and procedural history is unnecessary. However, we briefly note the following based upon our review of the certified record.

_____

[3] We deny Appellant's application for a new trial based on after discovered evidence without prejudice to his right to raise the issue in a collateral petition. Further, we deny Appellant's application to strike the Commonwealth's untimely brief. Appellant has not identified any prejudice he has suffered due to the late filing. So while we do not condone the Commonwealth's failure to file a timely brief, we decline to impose the sanction of striking the Commonwealth's brief entirely.

On March 16, 2017, the Commonwealth charged Appellant by way of a criminal information with terroristic threats,[4] PIC, simple assault, public drunkenness,[5] disorderly conduct,[6] and three counts of harassment.[7] The charges arose out of an incident that took place on January 14-15, 2017, at Kiro's bar. At trial, although there were minor inconsistencies, the Commonwealth witnesses testified consistently about the events of the evening.

That night,[8] Breanne Spangler, her fiancé Daniel Leiphart, and a group of their friends, who included Brittany Graves, Bridget James, and Emily and Devon Wallick, were at Kiro's to celebrate its last night in business. Appellant and his wife, Tara Moss, were also present but were not part of Spangler's group.

_____

[4] 18 Pa.C.S.A. § 2706(a)(1).  Following the close of the Commonwealth's case, the trial court granted Appellant's motion to dismiss this charge.  N.T., 3/12-13/18, at 246.

[5] 18 Pa.C.S.A. § 5505. The trial court found Appellant not guilty of public drunkenness.  N.T., 3/12-13/18, at 332.

[6] 18 Pa.C.S.A. § 5503(a)(1). The trial court held that this charge merged with the verdict on simple assault. ***See id.***

[7] The trial court initially found Appellant guilty of all three counts of harassment. ***See id.***  However, it dismissed one count as being unsupported by the evidence during the hearings on Appellant's post-sentence motions. N.T. Post-Sentence Motions, 8/13/18, at 201.

[8] We take the underlying facts from the notes of testimony at Appellant's second trial. ***See*** N.T., 3/12-13/18, at 70-80, 97-107, 118-25, 133-42, 154-61, 165-70, 175-87; 3/13/18, at 197-209, 212-226.

At some point during the evening, Appellant and Tara Moss left. Appellant returned alone a few minutes later and began to behave in an increasingly belligerent and drunken fashion. He started to accost and grope some of the women in Spangler's group, ignoring their requests to stop.

When Leiphart became aware of the problem, he and Appellant engaged in a verbal dispute, which ended when Leiphart punched Appellant on the chin. The bar's owner, Ronald Weagley, now aware of the complaints about Appellant's behavior, escorted him off the premises.

The group of friends remained in the bar. Immediately prior to closing, at approximately 2:00 a.m., Tara Moss telephoned Weagley and informed him Appellant had armed himself with knives and was returning to the bar. Weagley locked the front door of the bar, called 911, and told the patrons not to leave.

Despite this, Leiphart and several others exited the bar through the side emergency exit. Although friends kept Leiphart and Appellant separated, a quarrel ensued in the parking lot next to Kiro's and continued into a nearby alley.

Appellant brandished a knife, swinging it from side to side while taunting the unarmed Leiphart. Spangler inserted herself between Appellant and Leiphart, grabbed the knife-blade, and attempted to deescalate the conflict. Appellant repeatedly told her he did not want to hurt her but wanted to hurt Leiphart. Spangler pushed against Appellant backing him away from Leiphart

while Appellant continued to swing the knife and state that he wanted to hurt Leiphart.

Other bar patrons backed Leiphart away from Appellant. Appellant did not leave the scene until he heard police sirens, at which point he allowed Spangler to grab the knife. When police apprehended the fleeing Appellant, they heard one knife fall off him, which they recovered under his body, and found two other knives on his person. The police located several other knives in the area where the altercation occurred.

Trial began on March 7, 2018, however, for reasons unrelated to this appeal, the parties agreed to a mistrial on March 8, 2018. Appellant's second trial began the following week. On March 13, 2018, the jury and trial court found him guilty of the aforementioned charges.

On April 9, 2018, the trial court sentenced Appellant as delineated above. Appellant, now proceeding *pro se*, filed timely post-sentence motions; the trial court held hearings on those motions and denied the motions on August 27, 2018. The instant, timely appeal followed.

Initially, we mention the following concerns. While this Court understands Appellant is proceeding *pro se*,

> . . . we note that it has been held that when an appellant raises an extraordinary number of issues on appeal, as in this case, a presumption arises that there is no merit to them. In ***United States v. Hart***, 693 F.2d 286, 287 n.1 (3rd Cir. 1982), the court had an opportunity to address this situation:
>
> > Because of the inordinate number of meritless objections pressed on appeal, spotting the one *bona*

- 5 -

*fide* issue was like finding a needle in a haystack. One of our colleagues has recently cautioned on the danger of "loquaciousness:"

> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that this is an irrebuttable presumption, but it is a presumption nevertheless that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.

> Aldisert, The Appellate Bar: Professional Competence and Professional Responsibility—A View From the Jaundiced Eye of One Appellate Judge, 11 Cap.U.L.Rev. 445, 458 (1982).

**Estate of Lakatosh**, 656 A.2d 1378, 1380 n.1 (Pa. Super. 1995).

Further, prior to analyzing the issues in Appellant's brief, this Court must determine whether Appellant properly preserved any issues for our review. **See Commonwealth v. Wholaver**, 903 A.2d 1178, 1184 (Pa. 2006)(holding that appellate courts may *sua sponte* determine whether issues have been properly preserved on appeal).

Rule 1925(b)(4) provides, in pertinent part:

(ii) The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge. The judge shall not require the

citation to authorities; however, appellant may choose to include pertinent authorities in the Statement.

\* \* \* \*

(iv) The Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver.

Pa.R.A.P. 1925(b)(4)(ii), (iv).

Here, Appellant filed a Rule 1925(b) statement that was over thirty pages in length. *See* Concise Statement of Errors Complained of on Appeal, 10/03/18, at 1-32. Given this, we would be well within our rights to find Appellant has waived all issues on appeal. *See Jiricko v. Geico Ins. Co.*, 947 A.2d 206, 210 (Pa. Super. 2008) (finding waiver appropriate remedy where appellant filed five-page incoherent statement of errors); *see also Kanter v. Epstein*, 866 A.2d 394, 401 (Pa. Super. 2004). However, the trial court admirably attempted to address Appellant's claims. *See* Trial Court Opinion, 4/26/19, at 14-45. Because of this, despite our grave reservations, we decline to find waiver and will address the issues in Appellant's appeal.

In his first two issues, Appellant challenges the sufficiency of the evidence. Appellant's Brief, at 3-10. Our standard of review is settled.

We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.

The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Mobley*, 14 A.3d 887, 889–90 (Pa. Super. 2011) (citation omitted). Here, the jury convicted Appellant of PIC and simple assault, and the trial court convicted him of harassment.

In his first claim, Appellant does not dispute the proof of the elements of simple assault, therefore we will not address them at this point; instead, he argues the Commonwealth did not disprove his claim of self-defense. *See* Appellant's Brief, at 3-6. We disagree.

The use of force against a person is justified when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person. *See* 18 Pa.C.S.[A.] § 505(a). When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt.

*Commonwealth v. Bullock*, 948 A.2d 818, 824 (Pa. Super. 2008).

In order for the Commonwealth to disprove self-defense, one of the following elements must exist: (1) the defendant used more force than was necessary to save himself from death, bodily injury, or the commission of a felony; (2) the defendant provoked the use of force; or (3) the defendant had a duty to retreat, which was possible to accomplish with complete safety. *See*

*Commonwealth v. Burns*, 765 A.2d 1144, 1148–49 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001). However, "[a]lthough the Commonwealth is required to disprove a claim of self-defense arising from any source beyond a reasonable doubt, a jury is not required to believe the testimony of the defendant who raises the claim." *Bullock*, *supra* at 824.

Based upon our review of the record, the Commonwealth's evidence was sufficient to negate the elements of self-defense. The evidence presented at trial established, following the altercation with Leiphart, Weagley escorted Appellant off the premises and Appellant left the area for at least thirty minutes. *See* N.T., 3/12-13/18, at 74-75. Appellant then chose to return to the bar and lay in wait for Leiphart armed with at least four knives. *See id.* at 89, 225-226.

When Leiphart exited the bar, Appellant stated several times that he wanted to hurt him; Appellant swung the knife in the direction of of Leiphart while acting in a violent and agitated manner. *See id.* at 77, 103. Appellant ignored Spangler's attempts to defuse the situation, repeatedly stating he wanted to hurt Leiphart and did not retreat on his own. *See id.* at 141, 150. Rather, Spangler pushed him back. *See id.* . Leiphart was unarmed. *See id.* at 159.

Accordingly, the evidence was sufficient to establish that Leiphart was not the aggressor. More importantly, the evidence was capable of establishing Appellant, armed with at least one knife, could not have reasonably believed

he was at any real risk from Leiphart. The only person who claims there was an alternate version of the events was Appellant and the finder-of-fact was free to disbelieve his arguments in light of the overwhelming evidence offered by the Commonwealth. *See Commonwealth v. Rivera*, 983 A.2d 1211, 1222 (Pa. 2009) (jury free to discredit evidence offered by defendant relating to self-defense); *see also Commonwealth v. Jones*, 332 A.2d 464, 466 (Pa. Super. 1974) (*en banc*) (holding use of knife in response to fistfight is not justified use of deadly force). Moreover, the record demonstrates Appellant, who was on a public alley, had many opportunities to retreat. *See Commonwealth v. Gillespie*, 434 A.2d 781, 784 (Pa. Super. 1981) (holding opportunity to retreat existed because, "the fight occurred on a public sidewalk, with several avenues of retreat available[]"). Appellant's first claim does not merit relief.

As Appellant's second issue is actually a broad based challenge to each of his convictions, *see* Appellant's Brief, at 7-10, we will address each type of crime individually. Initially, we note Appellant's argument in its entirety consists of citing to isolated bits of evidence he believes favors his argument along with random citations to several United States Supreme Court cases and one case from this Court, which, upon review, have no bearing upon the instant matter. *See id.* He entirely disregards our standard of review, which requires we view the evidence in a light most favorable to the Commonwealth

- 10 -

as verdict winner. Further, Appellant overlooks the fact this Court does not re-weigh the evidence nor do we engage in credibility determinations. **See id.**

We define simple assault by physical menace as, "attempts by physical menace to put another in fear of imminent serious bodily injury." 18 Pa.C.S.A. § 2701(a)(3). Serious bodily injury is "[b]odily injury which creates a substantial risk of death, or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). An individual acts intentionally with respect to a material element of an offense when, "it is his conscious object to engage in conduct of that nature or to cause such a result." 18 Pa.C.S.A. § 302(b)(1)(i).

Therefore, in order to sustain a conviction for simple assault by physical menace, the Commonwealth must prove an appellant "intentionally plac[ed] another in fear of imminent serious bodily injury through the use of menacing or frightening activity." **Commonwealth v. Reynolds**, 835 A.2d 720, 726 (Pa. Super. 2003) (citation omitted). The act of brandishing a knife at a person is sufficient to sustain a conviction for simple assault by physical menace. **See Commonwealth v. Diamond**, 408 A.2d 488, 489–90 (Pa. Super. 1979) (finding sufficient evidence to sustain simple assault by physical menace conviction where defendant approached and gripped door handle of victim's

car at 4:00 a.m., "especially since [defendant's] friend was simultaneously threatening [the victim] with a knife on the other side of the car").

As set forth previously, the Commonwealth's evidence at trial showed Appellant swung the knife back and forth while threatening Leiphart. Appellant repeatedly stated he wanted to hurt him. This evidence is sufficient to establish that Appellant wanted to place Leiphart in fear of serious bodily injury. A reasonable person, seeing the man whom he earlier hit in a bar fight coming at him while shouting threats and waving a knife, "will quite likely fear that such an injury is imminent." **Diamond**, 408 A.2d at 490. Appellant must "be held to have intended such a foreseeable consequence to his actions." **Id.** Accordingly, we find the evidence was sufficient to sustain Appellant's conviction for simple assault by physical menace.

In order to prove possession of an instrument of crime, the Commonwealth must show the defendant "possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a). The statute defines an instrument of crime as "[a]nything specially made or specially adapted for criminal use" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S.A. § 907(d). Evidence a defendant used a knife to attempt to perpetrate a crime is sufficient to sustain a conviction for PIC. **See Commonwealth v. Robinson**, 874 A.2d 1200, 1208–09 (Pa. Super. 2005) (holding use of knife to perpetrate robbery was sufficient evidence of PIC).

"PIC, by its definition, is an inchoate crime, meaning that a defendant only has to intend to employ the instrument of crime criminally; a defendant need not actually employ it or complete an associated crime." ***Commonwealth v. Moore***, 103 A.3d 1240, 1252 (Pa. 2014) (citation omitted). "[R]ather, the focus is on whether the defendant possesses the instrument for **any** criminal purpose." ***Commonwealth v. Naranjo***, 53 A.3d 66, 71 (Pa. Super. 2012) (emphasis in original). The defendant's criminal purpose provides the basis for his liability; we can infer purpose from the circumstances surrounding the possession of the instrument of crime. ***See Commonwealth v. Andrews***, 768 A.2d 309, 318–319 (Pa. 2001).

"Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances." ***Commonwealth v. Miller***, 172 A.3d 632, 641 (Pa. Super. 2017) (citation omitted), *appeal denied*, 183 A.3d 97 (Pa. 2018). Although a factfinder may infer criminal intent beyond a reasonable doubt based on circumstantial evidence, intent may not be inferred based on mere possession. ***See In re A.V.***, 48 A.3d 1251, 1254 (Pa. Super. 2012).

Here, the evidence demonstrated Appellant used kitchen knives to threaten Leiphart. Clearly, this was not in a manner appropriate for lawful use. The evidence supporting Appellant's conviction for simple assault is sufficient to sustain his conviction for PIC. ***See Robinson***, 874 A.2d at 1208-09.

Appellant also challenges his two convictions for harassment. "A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:  [ ] strikes, shoves, kicks **or otherwise subjects the other person to physical contact**, or attempts or threatens to do the same[.]"  18 Pa.C.S. § 2709(a)(1) (emphasis added).  "An intent to harass may be inferred from the totality of the circumstances."  ***Commonwealth v. Cox***, 72 A.3d 719, 721 (Pa. Super. 2013).

At trial, multiple witnesses testified Appellant grabbed the buttocks of several women, including Emily Wallick and Bridget James, thus subjecting them to physical contact. ***See***, ***e.g.***, N.T. 3/12-13/18, at 121-122. The evidence also showed Appellant ignored the women's request to stop. ***See id.*** This is sufficient to show his intent to harass the women. ***See Cox***, ***supra*** at 721; ***see also*** 18 Pa.C.S.A. § 2709(a)(1).

Accordingly, for the reasons discussed above, we find the evidence was sufficient to sustain Appellant's convictions. His second claim does not merit relief.

In his third claim, Appellant avers the Commonwealth violated his constitutional rights when "it used evidence at trial that was not stated in the indictment bills of particulars."  Appellant's Brief, at 10; ***see also*** Appellant's Brief, at 10-11. Specifically, Appellant complains the Commonwealth charged him for holding the knife over his head in a stabbing position but the witnesses at trial only testified he was either swinging the knife or brandishing it.

This Court has stated:

> A purported variance between the indictment and the offense proved will not be fatal to the Commonwealth's case unless it could mislead the defendant at trial, involves an element of surprise prejudicial to the defendant's efforts to prepare his defense, precludes the defendant from anticipating the prosecution's proof, or otherwise impairs a substantial right of the defendant. Generally stated, the requirement is that a defendant be given clear notice of the charges against him so that he can properly prepare a defense.

**Commonwealth v. Fulton**, 465 A.2d 650, 653 (Pa. Super. 1983) (citations omitted). Moreover, "a variance between the proof and the bill of particulars does not require a reversal unless the defendant has been prejudiced by the variance." **Commonwealth v. Delbridge**, 771 A.2d 1, 4-5 (Pa. Super. 2001) (citation omitted), *affirmed*, 859 A.2d 125 (Pa. 2004).

Here, the criminal information stated in pertinent part, "[Appellant] attempted, by physical menace, to put Danny Leiphart, in fear of imminent serious bodily injury, by holding a knife over his head in a stabbing position **and/or** stating he was going to get victim." Criminal Information, 3/16/17, at unnumbered page 1 (emphasis added). At trial, as noted above, multiple witnesses testified that, while holding the knife, Appellant repeatedly stated he wanted to hurt the victim. Moreover, the difference between holding the knife over his head and swinging the knife in the direction of the victim is *de minimis*. Appellant has utterly failed to address how this minor discrepancy between the information and the proof at trial prejudiced him. Therefore, his third claim does not merit relief. **See Delbridge**, 771 A.2d at 4-5.

In his fourth claim, Appellant contends that the trial court deprived him of his right of self-representation. Appellant's Brief, at 12-13. We disagree.

We review a trial court's grant or denial of a defendant's request to proceed *pro se* for an abuse of discretion. **Commonwealth v. El**, 977 A.2d 1158, 1167 (Pa. 2009). The Pennsylvania Supreme Court has "defined a court's discretion as the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. An abuse of that discretion is not merely an error of judgment, but . . . [a] manifestly unreasonable . . . result of partiality, prejudice, bias or ill will." **Id.** (quotations and citation omitted).

In **El**, our Supreme Court explained,

A criminal defendant's right to counsel under the Sixth Amendment includes the concomitant right to waive counsel's assistance and proceed to represent oneself at criminal proceedings. The right to appear *pro se* is guaranteed as long as the defendant understands the nature of his choice. In Pennsylvania, Rule of Criminal Procedure 121 sets out a framework for inquiry into a defendant's request for self-representation. Pa.R.Crim.P. 121. Where a defendant knowingly, voluntarily, and intelligently seeks to waive his right to counsel, the trial court . . . must allow the individual to proceed *pro se*.

The right to waive counsel's assistance and continue *pro se* is not automatic however. Rather, only timely and clear requests trigger an inquiry into whether the right is being asserted knowingly and voluntarily. . . . Thus, the law is well established that in order to invoke the right of self-representation, the request to proceed *pro se* must be made timely and not for purposes of delay and must be clear and unequivocal.

**Id.** at 1162-63 (most citations, quotation marks and footnotes omitted).

- 16 -

Our review of the record reveals Appellant never made a clear and unequivocal assertion of the right to proceed *pro se*. **See** N.T., 3/7/18, at 3-23. Rather, the record shows the trial court made a yeoman's effort in an attempt to ascertain what Appellant wanted and to explain to him Pennsylvania law does not allow his desire, which was clearly hybrid representation. **See id.**; **see also Commonwealth v. Padilla**, 80 A.3d 1238, 1259 (Pa. 2013), *cert. denied*, 573 U.S. 907 (2014). The discussion concluded as follows:

> THE COURT:  So how are you proceeding?
>
> [Appellant]:  I have no choice but to allow counsel to represent me.
>
> THE COURT:  So Mr. Jefferis will be the lead counsel, and you will be working with him or consult with him?
>
> [Appellant]:  That is correct, sir. However, it is my understanding that a represented person is allowed to give opening arguments. That is a Pennsylvania Rule of Criminal Procedure.
>
> THE COURT:  Whoever the attorney is may make the opening argument. In other words, what you can't do is you can't cherry pick or break this up into pieces where you say, I'll make the opening statement, you make the closing statement, I'll examine this witness, you examine that witness. You can be *pro se*, or you can be represented by an attorney. What you don't get to do is have this kind of hybrid representation.
>
> [Appellant]:  And I understand that, sir, and like I said, due to my 14-month unjust incarceration, I would not be able to represent myself.
>
> * * * *

[THE COURT]: . . . are you still willing to have him proceed as your counsel?

[Appellant]: Indeed, I am.

N.T., 3/07/18, at 17-18.

Appellant did subsequently indicate that he wished to represent himself. *See id.* at 20. However, immediately thereafter he stated that it didn't matter who represented him. *See id.*, at 23.

Appellant does not identify any other place in the record where he clearly requested to proceed *pro se*. And our independent review has revealed none. Therefore, the record does not contain a clear and unequivocal request to proceed *pro se*. Accordingly, Appellant's fourth claim does not merit relief. *See El*, 977 A.2d at 1162-63.

In his fifth claim, Appellant complains the trial court denied him the right to cross-examine Commonwealth witness Breanne Spangler effectively. The court sustained the Commonwealth's objection to a question about Spangler's desire not to press charges in the matter. *See* Appellant's Brief, at 13-15. Specifically, Appellant points to the following:

[Defense Counsel]: At first, you did not want to press charges?

[The Commonwealth]: Objection, Your Honor.

[Defense Counsel]: I think this goes to the witness's state of mind.

[The Commonwealth]: Relevance, though.

[Defense Counsel]: Bias.

[The Commonwealth]: Approach?

THE COURT: Come up here.

\* \* \* \*

[Defense Counsel]: Your Honor, this would directly go to her — this would directly go to her bias on why she's testifying here today. She changed her mind about pressing charges once her boyfriend or fiancé was charged.

[The Commonwealth]: It was never her option to press charges or not. It's not that she could've said, well, I want to press charges [sic] and this would've gone away.

[Defense Counsel]: I know, but she didn't want to cooperate or testify to what she testified to here today.

THE COURT: I'm going to sustain the objection.

N.T. Second Trial, 3/12/18, at 92-93.

This Court has held:

> [w]ith regard to evidentiary challenges, it is well established that [t]he admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Furthermore, if in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

***Commonwealth v. Serrano***, 61 A.3d 279, 290 (Pa. Super. 2013) (citations and internal quotation marks omitted).

A criminal defendant has the constitutional right to confront witnesses against him; this right includes the right of cross-examination. ***See***

***Commonwealth v. Buksa***, 655 A.2d 576, 578 (Pa. Super. 1995). Cross-examination can be used to test a witness's version of the events, to impeach his credibility, or to establish his motive for testifying. ***See id.***

However, even if we were to find error, an appellant must show that the court's decision prejudiced him. Our Supreme Court has stated:

> An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is overwhelming, so that by comparison the error is insignificant. . .

***Commonwealth v. Mitchell***, 839 A.2d 202, 214-15 (Pa. 2003) (citation omitted).

In the instant matter, we need not decide whether the trial court erred in sustaining the objection because, if there was error, it was harmless. The record reflects Spangler's fiancée, Leiphart, admitted he threw the first punch in the altercation in the bar; the Commonwealth charged him because of it; and he pleaded guilty to harassment. N.T. Second Trial, 3/12/18, at 135-37, 142-43.

Moreover, there were multiple witnesses to the event, and the witnesses' testimony was consistent. ***See*** N.T., 3/12-13/18, at 70-80, 97-107, 118-25, 133-42, 154-61, 165-70, 175-87. Thus, regardless of whether Spangler was reluctant to testify or was biased against Appellant, witnesses Leiphart, James, Graves, Weagler, and the Wallicks all confirmed her

testimony. *See id.* Given this, we find Appellant has not and cannot show the absence of this cross-examination prejudiced him. Therefore, this claim does not merit relief. *See Mitchell*, 839 A.2d at 214-15.

In his sixth claim, Appellant argues that the Commonwealth destroyed evidence in violation of the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Appellant's Brief, at 15-17. We disagree.

Again, we note that we review evidentiary challenges under an abuse of discretion standard. *Serrano*, 61 A.3d at 290.

The law governing alleged *Brady* violations is settled.

> Under *Brady* and subsequent decisional law, a prosecutor has an obligation to disclose **all exculpatory information** material to the guilt or punishment of an accused, including evidence of an impeachment nature. To establish a *Brady* violation, an appellant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued. The burden rests with the appellant to prove, by reference to the record, that evidence was withheld or suppressed by the prosecution. The evidence at issue must have been material evidence that deprived the defendant of a fair trial. Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Ovalles*, 144 A.3d 957, 965 (Pa. Super. 2016) (citations and quotation marks omitted) (emphasis added).

In **Commonwealth v. Feese**, 79 A.3d 1101 (Pa. Super. 2013), this Court discussed the appropriate standard to apply in cases where, as here, the appellant alleges the Commonwealth destroyed potentially useful evidence. The **Feese** court determined the standard announced by the United States Supreme Court in **Arizona v. Youngblood**, 488 U.S. 51 (1988) applies, and "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." **Feese**, 79 A.3d at 1108 (citation omitted). The Court further stated, "[w]hen the value of such evidence was not clear before its destruction, the burden is on the defense to demonstrate bad faith." **Id.** at 115.

Here, Appellant alleges the Commonwealth destroyed an audio recording made by the trial prosecutor during his initial interview with Commonwealth witness Devon Wallick. **See** Appellant's Brief, at 16-17. The parties litigated the issue of the destroyed audio recording at the second hearing on Appellant's post-sentence motions. **See** N.T., Post-Sentence Motions Hearing, 8/27/18, at 2-7.

At the hearing, the Commonwealth explained it had not previously interviewed Wallick, but it subpoenaed him and he appeared to testify at Appellant's first trial. **See id.** at 2-4. The trial assistant district attorney wanted Wallick to speak with a detective; because he did not have any paper with him, he recorded Wallick's contact information on his cell phone. **See id.**

at 2, 4, 7. He later destroyed the recording. A detective conducted a substantive interview with Wallick and the Commonwealth turned over the notes of that interview to Appellant. *See id.* at 2-4.

We have reviewed the record in this matter. Appellant does not dispute he received the interview notes. Further, the trial court specifically found the recording was not exculpatory, and noted, "any exculpatory evidence would have been contained in the actual interview with detectives, which produced a report, which was turned over to the defense." Trial Court Opinion, 4/26/18, at 25. Appellant has not presented any evidence that would call this finding into doubt. Moreover, Appellant has not argued any facts demonstrating the Commonwealth acted in bad faith. Therefore, Appellant's sixth claim does not merit relief. *See Feese*, 79 A.3d at 1111.

In his seventh claim, Appellant contends he received ineffective assistance of trial counsel and the trial court erred in finding that he could only raise such claims in a Post-Conviction Relief Act Petition.[9] *See* Appellant's Brief, at 18-32. This ineffectiveness claim, however, is premature.

In *Commonwealth v. Holmes*, 79 A.3d 562 (Pa. 2013), the Pennsylvania Supreme Court reaffirmed the general rule first set forth in *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), "claims of ineffective assistance of counsel are to be deferred to PCRA review; trial courts should

_____

[9] 42 Pa.C.S.A. §§ 9541-9546.

not entertain claims of ineffectiveness upon post-verdict motions; and such claims should not be reviewed upon direct appeal." **Holmes**, 79 A.3d at 576. Although there are three recognized exceptions to that general rule, no exception is applicable here.[10,11] Accordingly, Appellant's ineffective assistance of counsel claim is not cognizable on direct appeal and must await collateral review.

In his eighth claim, Appellant argues the trial court erred in denying his motion for appointment of a neurological/head trauma expert. **See** Appellant's Brief, at 32-34. We disagree.

---

[10] The **Holmes** Court recognized two exceptions: (1) where the trial court determines a claim of ineffectiveness is "both meritorious and apparent from the record so that immediate consideration and relief is warranted[;]" or (2) where the trial court finds "good cause" for unitary review, and the defendant makes a "knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA." **Holmes**, 79 A.3d at 564, 577 (footnote omitted). A third exception was recently adopted by our Supreme Court for "claims challenging trial counsel's performance where the defendant is statutorily precluded from obtaining PCRA review." **Commonwealth v. Delgros**, 183 A.3d 352, 361 (Pa. 2018) ("[W]here the defendant is ineligible for PCRA review because he was sentenced only to pay a fine, we agree with Appellant that the reasoning in **Holmes** applies with equal force to these circumstances").

[11] We note, in its 1925(a) opinion, the trial court did address Appellant's claims and found them to be meritless. Trial Ct. Op., at 25-39. However, this is of no matter to our decision because Appellant did not and has not made any waiver of his right to seek PCRA relief, let alone a knowing and express waiver. **See Holmes**, 79 A.3d at 577.

There are several procedural issues with Appellant's motion. First, Appellant filed this motion *pro se* on February 26, 2018. At that time, counsel represented Appellant. As we have noted above, Appellant is not entitled to hybrid representation. **See Padilla**, 80 A.3d at 1259. Therefore, courts in this Commonwealth "will not accept a *pro se* motion while an appellant is represented by counsel; indeed, *pro se* motions have no legal effect and, therefore, are legal nullities." **Commonwealth v. Williams**, 151 A.3d 621, 623 (Pa. Super. 2016) (citation omitted).

Secondly, at the time Appellant filed the motion, the court had not granted him *in forma pauperis* status and retained counsel represented him. Our rules only require the allocation of funds for an expert witness for indigent defendants. **See** 50 P.S. § 7402(f). Lastly, the motion was untimely. The Pennsylvania Rules of Criminal Procedure require a defendant give notice of a defense of insanity or mental infirmity "not later than the time required for filing an omnibus pretrial motion provided in Rule 579." Pa.R.Crim.P. 568(a)(1). Here, that time expired in May 2017, approximately ten months before Appellant filed his motion. **See** Pa.R.Crim.P. 579(A).

Further, as the trial court correctly notes, a diminished capacity defense is only available if the Commonwealth charges a defendant with murder in the first degree. **See Commonwealth v. Russell**, 938 A.2d 1082, 1092 (Pa. Super. 2007) (citations omitted). Moreover, an insanity defense is generally only available in cases where the defendant acknowledges commission of the

act, not in a case such as this where a defendant asserts his innocence. *See Commonwealth v. Hughes*, 865 A.2d 761, 788 (Pa. 2004) (stating, "[a] defense of insanity acknowledges commission of the act by the defendant, while maintaining the absence of legal culpability").

In any event, Appellant's claim is based on his unsupported contention, "there [was] a reasonable probability that the Appellant was suffering from a concussion due to the multiple blows to the head inflicted upon Appellant[,]" during the altercation inside the bar and this probable concussion somehow negated his ability to form the requisite intent. Appellant's Brief, at 33. Our review of the record shows Appellant has never claimed he sought medical treatment following the incident and has never offered any medical documentation to support his speculative contention he suffered a concussion because of the altercation. For the reasons discussed above, Appellant's eighth claim does not merit relief.

In his final claim, Appellant argues the trial court erred in denying his speedy trial motion. Appellant's Brief at 34-37. To address this issue we observe the following standards.

"When reviewing a trial court's decision in a Rule 600 case, an appellate court will reverse only if the trial court abused its discretion." *Commonwealth v. Bradford*, 46 A.3d 693, 700 (Pa.2012). Moreover,

> [t]he proper scope of review . . . is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.

* * * *

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters . . ., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Peterson*, 19 A.3d 1131, 1134 (Pa. Super. 2011) (*en banc*), *affirmed*, 44 A.3d 655 (Pa. 2012) (citations omitted).

We have reviewed the certified record, the briefs of the parties, and the trial court's opinion. The trial court ably and methodically addressed this issue in its Rule 1925(a) opinion. Accordingly, we adopt the trial court's reasoning, found on pages 42-45 of its opinion, as our own for the disposition of this issue. **See** Trial Court Opinion, 4/26/19, at 42–45 (holding mechanical run date was January 15, 2018; trial was set for July of 2017 but defense counsel requested continuance due to unavailability; next available trial date was in September 2017; 57 days were attributable to defense; therefore trial started before adjusted mechanical run date of March 13, 2018); **see also** N.T., 3/7/18, at 24-27. Appellant's ninth and final claim does not merit relief.

Accordingly, for the reasons discussed above, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/10/2020



**Defendant-Name:**

## Craig Eugene Moss



**Case Number**



*CP-67-CR-0001471-2017*

OTN:

**U 010868-4**

| Serviced TO: | BY: | Mail | CERT Mail | Inter-Office | Hand DEL | FAX | E-MAIL |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

Notes:

☐ Docketed in CPCMS    Date:

☐ Scanned Images OK - Verified / QC'd

┌─────────────────────────────────────┐
│ ☐  **RE-SCAN needed** │
│ Reason: │
│ │
│ │
│ │
│ RETURN TO RECORDS UNIT │
└─────────────────────────────────────┘

I attest and certify that as Deputy Clerk of Courts I have properly Serviced and Docketed the documents related to this case action and have verified the completeness and image quality of the scanned documents.

Signature or Stamp - Deputy Clerk of Courts

Bortner, Michael E.

## Georgine Keiser - York County Clerk of Courts

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH | : | CP-67-CR-0001471-2017 |
| | : | |
| v. | : | 1533 MDA 2018 |
| | : | |
| CRAIG EUGENE MOSS, | : | |
| Defendant/Appellant | : | |

COUNSEL OF RECORD:

James E. Zamkotowicz, Esquire
Counsel for the Commonwealth

Craig E. Moss
*Pro se*

## OPINION IN SUPPORT OF ORDER PURSUANT TO RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

The Court received a Notice of Appeal, docketed on September 12, 2018, that Craig E. Moss, appeals to the Superior Court of Pennsylvania this Court's Order that was entered on August 27, 2018. The Court has reviewed the record. The Court now issues this Opinion in support of our Order that was issued on August 27, 2018.

## I. Procedural History

By an Information docketed on March 16, 2017, the Appellant was charged in count 1 with terroristic threats,[1] in count 2 with possession of instruments of crime,[2] in count 3 with simple assault,[3] in count 4 with public drunkenness,[4] in count 5 with disorderly

---

1 18 Pa.C.S.A. § 2706(a)(1)
2 18 Pa.C.S.A. § 907(a)
3 18 Pa.C.S.A. § 2701(a)(3)
4 18 Pa.C.S.A. § 5505

1

conduct,[5] and in counts 6, 7, and 8 with harassment/strike, shove, kick, etc.[6] The matters were due to proceed before our colleague, the Honorable Harry M. Ness; however, owing to the trial scheduling system utilized by York County, the matters were transferred to this Court for trial on March 7, 2018. On March 8, 2018, by agreement of the parties and the Appellant, a mistrial was granted. Trial commenced on March 12, 2018. Following the close of the Commonwealth's case, this Court dismissed the terroristic threats charge. At the conclusion of the trial, the jury returned verdicts of guilt on possession of instruments of crime and on simple assault. Regarding the remaining summaries, this Court found the defendant not guilty of public drunkenness and merged the disorderly conduct into the simple assault conviction. The Court went on to find the defendant guilty of all three charges of harassment. However, count 8, which covered harassment by the appellant of Brittany Graves was later dismissed during post-sentence motions as being unsupported by the evidence presented at trial. (Notes of Testimony, 8/3/18, at 20.) Sentencing was set for April 2, 2018. Sentencing was continued to April 9, 2018 to accommodate Adult Probation's request for more time to complete a pre-sentence investigation. On April 9, 2018, the Appellant received one year less a day to two years less two days for possession of instruments of a crime and simple assault, which were to be served concurrently. Additionally, the Court ordered a $50.00 fine on each of the harassments. Post-sentence

---

5 18 Pa.C.S.A. § 5503(a)(1)
6 18 Pa.C.S.A. § 2709(a)(1)

2

motions were filed on April 11, 2018 and were scheduled for May 31, 2018. An Order granting a court stenographer an extension until July 4, 2018 to file a transcript was issued May 29, 2018. On May 31, 2018, the Appellant's post-sentence motions hearing was continued until August 3, 2018. A number of the Appellant's post-sentence motions were denied on August 3, 2018; however, the Appellant having raised a matter regarding the potential destruction of evidence, a continuance was granted for the Commonwealth to ascertain if any evidence was destroyed. Via a motion docketed on August 13, 2018, the Appellant requested reconsideration of the denial of his post-sentence motions. The matter regarding the destruction of evidence was denied on August 27, 2018.

On September 12, 2018, the Appellant filed his Notice of Appeal of this Court's Order of August 27, 2018. On October 3, 2018, pursuant to the Pennsylvania Rules of Appellate Procedure, Rule 1925(b), the Appellant was directed to file a statement of matters complained of. On October 3, 2018, the Appellant complied and submitted his Concise Statement of Matters Complained of On Appeal, which lists nine matters complained of on appeal. Those matters, stated by the Appellant, are as follows:

A. Commonwealth fail [sic] to disprove Appellants [sic] claim of self[-]defense[.]

B. Was the trial court's decision not to grant Appellant post[-]sentencing relief under insufficiency of the evidence contrary to <u>Jackson v[.] Virginia</u>

C. The Commonwealth deprived Appellant of his 5th, 6th, & 14th Amendment rights when it used evidence at trial that was not stated in the <u>Indictment or Bill of</u>

3

Particulars

D. The trial court deprieved [sic] Appellant of his 6th and 14th Amendment right to self[-]representation

E. Appellant was constructively deprived of his 6th Amendment right to effective cross-examination when the trial court failed to allow defense counsel the right to show Commonwealths [sic] witness Spanglers [sic] biases

F. Appellant was constructively deprieveved [sic] of his right to a fair trial when the Commonwealth suppressed then destroyed requested video/audio evidence

G. The trial court abused its descretion [sic] in ruling that Appellant could not raise ineffective assistance of counseluntil [sic] post[-]conviction

H. The trial courts [sic] decision to deny Appellant motion for neurological/head trauma expert contrary to clearly established law as decided by the United States Supreme Court in Clark v. Arizona and McWilliams v[.] Dunn

I. The trial court errored [sic] when it denied Appellants [sic] motion to dismiss for violation of Appellants [sic] 6th Amendment right to speedy trial.

Concise Statement of Matters Complained of On Appeal, at 1-2. We turn next to a recitation of the relevant facts.

## II.    Facts

The first witness, Breanne Spangler, took the stand and testified that late on January 14, 2017 and into the early hours of January 15, 2017, she was with her fiancé at Kiro's bar

4

to celebrate its last night in business. (Notes of Testimony, 3/12/18, at 71.) Ms. Spangler stated that everyone was having a good time until her friends told her that the defendant was groping them. *Id.*, at 72. The defendant had been acting fine until his wife left and then he started touching women. *Id.*, at 74. After the girls asked the defendant to stop touching them, the defendant and Danny got into a scuffle. *Id.*, at 73. Ms. Spangler had seen the defendant and Danny argue; however, Ms. Spangler went to the bathroom and, upon emerging from it, Ms. Spangler testified that she witnessed chaos. *Id.*, at 74. The bar owner, Ron, escorted the defendant out of the bar and all was fine until the defendant returned about an hour later. *Id.*, at 75. Ms. Spangler and her group were about to leave when Ron told them that they could not because the defendant was outside with a knife. *Ibid.* Danny then left via a side door. *Ibid.* On cross-examination, Ms. Spangler stated that Ron told them something to the effect that the defendant's wife, Tara, had called to warn the bar patrons that the defendant was returning to the bar with a knife. *Id.*, at 89.

Upon proceeding outside, Ms. Spangler saw her fiancé and friends in an alley with the defendant. *Id.*, at 76. The defendant was swinging a knife, which caused Ms. Spangler to get between the defendant and Danny and to grab the blade of the knife whilst telling the defendant that he did not wish to act in this manner, that the defendant was behaving stupidly, and that the defendant should go home. *Ibid.* The defendant continuously replied that he did not wish to hurt Ms. Spangler; but, rather, the defendant "just wanted [to] get Danny, he wanted to hurt Danny." *Id.*, at 77. The defendant was being aggressive and making

5

taunts along the lines of look at my new knife. *Ibid.* Ms. Spangler did not know if the defendant specifically stated that he wanted to stab Danny, she just knew that the defendant wanted to hurt Danny. *Id.*, at 78. Ms. Spangler testified that the defendant and Danny had been circling one another down the alley before she inserted herself between them and began trying to push the defendant back towards 10th Avenue. *Id.*, at 78-79. Later, Ms. Spangler admitted that both the defendant and Danny were angry. *Id.*, at 90. The defendant eventually dropped the knife, Ms. Spangler picked it up, and Ms. Spangler was told to drop the knife when the police arrived. *Id.*, at 80.

During cross-examination, defense counsel wished to query whether Ms. Spangler deviated from her initial inclination not to press charges against the defendant and the Commonwealth objected. *Id.*, at 92. Defense counsel offered this line of questioning to demonstrate bias and the Commonwealth responded that the decision to charge the defendant was never in Ms. Spangler's hands. *Id.*, at 92-93. The defense proffered that Ms. Spangler did not wish to cooperate or testify; however, this Court sustained the objection. *Id.*, at 93.

The next witness, Brittany Graves, testified that she was at Kiro's for its last night of operations. *Id.*, at 98. Ms. Graves told the jury that there were multiple occurrences of the defendant touching her friends inappropriately, which resulted in a scuffle in the bar. *Id.*, at 99. The defendant's genial behavior deteriorated throughout the night as he continued imbibing. *Id.*, at 99-100. After the defendant ignored multiple warnings to keep his hands to himself, Danny ended up defending his female friends and the defendant was then asked to

6

leave. *Id.*, at 100-01. Ms. Graves did not see Danny throw a punch, but she attempted to extricate him from the ensuing melee. *Id.*, at 101. About an hour after the defendant was removed from the bar, the bar owner, Ron, warned the group that the defendant had returned with a knife and then Danny bolted out of a side door. *Id.*, at 102. Ms. Graves also exited and described a defendant who became increasingly belligerent as Danny and Ms. Graves approached him. *Id.*, at 102-03. Ms. Graves described the defendant as baiting them with the knife and asking if they wanted a fight. *Id.*, at 103. As Danny and Ms. Graves approached, the defendant drew closer before running down the alley. *Id.*, at 104. On cross-examination, Ms. Graves clarified that the defendant was never running for his life; rather, the defendant was backing away whilst swinging a knife and threatening Danny. *Id.*, at 114. And, on redirect, it Ms. Graves testified that the defendant had not disengaged and was acting in a dangerous manner with the knife. *Id.*, at 116. Ms. Graves confirmed Ms. Spangler's account of Ms. Spangler coming between the defendant and Danny and while offers to fight were made. *Id.*, at 105. Ms. Graves then described how she and the officers recovered multiple knives from the alley. *Id.*, at 106. Ms. Graves described the path of the altercation being littered with knives. *Id.*, at 107.

Bridget James was the next witness and was a patron of Kiro's on the night in question. *Id.*, at 119. Ms. James described how her night deteriorated following the defendant grabbing herself and others. *Id.*, at 119-20. Ms. James stated that the defendant grabbed her buttock and that she told him not to do so. *Id.*, at 121. Bridget James saw the altercation

7

between Danny and the defendant in the bar. *Id.*, at 122. During the incident in the alley, Ms. James was attempting to deescalate Danny who had nothing in his hands. *Id.*, at 123-24. On cross-examination, Ms. James agreed that Danny and the defendant were swinging at one another in the alley. *Id.*, at 128.

The defendant's interlocutor, Danny Leiphart, was the next witness. *Id.*, at 133. Danny was in attendance to celebrate the closing of Kiro's. *Id.*, at 134. Danny stated that the defendant was grabbing women's behinds, that they'd unsuccessfully sought to have the defendant removed from the bar, and that he believed the situation was over when the defendant left with his wife. *Id.*, at 136. Later, when the defendant had, based upon Danny's testimony, returned to the bar, Danny confronted the defendant. *Ibid.* Danny described a quickly escalating situation that culminated in his punching the defendant and this first incident ending quickly with people in between Danny and the defendant. *Id.*, at 137. During cross-examination, Danny admitted that he had wanted to hit the defendant again and was being pushed back. *Id.*, at 147. The defendant was removed from the bar and, ultimately, Danny was charged with harassment. *Id.*, at 137. On cross-examination, defense counsel elicited that Danny pleaded guilty to this charge. *Id.*, at 143.

Turning to the second incident, Danny agreed with earlier witnesses that Ron attempted to keep Danny in the bar when the defendant returned, but Danny exited to confront the man he had been told was looking to stab him. *Id.*, at 138. Danny perceived that the defendant had returned to retaliate against him. *Id.*, at 140. In response to the

8

Commonwealth, Danny explained that the defendant could not have returned to apologize because apologies do not end with knives. *Id.*, at 151. On cross-examination, Danny stated it was possible he wanted to hit the defendant again. *Id.*, at 148. Danny recounted how Devon and Breanne got between Danny and the defendant and that Breanne was attempting to stop the defendant. *Id.*, at 141. Responding to defense counsel, Danny testified that he and the defendant were trying to get at one another and that Danny was pushing the defendant back down the alley by causing the defendant to back away. *Id.*, at 149. On redirect, Danny clarified that his girlfriend was forcing the defendant down the alleyway as she attempted to deescalate the situation. *Id.*, at 150. And on re-cross-examination, Danny agreed with defense counsel that as Breanne forced the defendant down the alleyway that he continued after the defendant. *Id.*, at 153.

Following Danny Leiphart's testimony, the Commonwealth called Emily Wallick who, along with her friends, was present to say goodbye to Kiro's. *Id.*, at 154-55. Ms. Wallick was not imbibing as she was the designated driver. *Id.*, at 155. Ms. Wallick testified that she was one of the females whose buttocks were grabbed by the defendant, which Ms. Wallick did not wish to happen. *Id.*, at 156. Pertaining to the first incident, Ms. Wallick saw the defendant talking to Ms. Spangler, noticed some ensuing commotion, and then saw the defendant removed from the premises. *Id.*, at 158. Later, as her group was preparing to leave, Ms. Wallick and her friends were told that they could not leave because the defendant had returned with knives. *Id.*, at 159. Upon exiting Kiro's, Ms. Wallick observed Ms. Spangler

9

attempting to stop the defendant from swinging his knife around by holding onto it. *Id.*, at 159. She observed nothing in Danny's hands. *Ibid.* Ms. Wallick was afraid that someone was going to be hurt because weapons and a lot of anger were involved. *Id.*, at 160. Ms. Wallick went on to testify that Ms. Spangler, not the defendant, was attempting to deescalate the situation and that she does not know that the defendant would have been backing up but-for Ms. Spangler's actions to deescalate. *Id.*, at 161.

The next witness, Devon Wallick, was at the bar with the foregoing witnesses, to hoist drinks to Kiro's. *Id.*, at 165. Mr. Wallick confirmed that the defendant was sneakily grabbing women's hindquarters and that the women were not appreciative of this. *Id.*, at 166. Though not entirely sure, Mr. Wallick testified that Danny approached the defendant and that a fight broke out inside of the bar. *Id.*, at 166. As with the other witnesses, Danny recounted the defendant being removed from the bar and, later, the group being told not to leave the bar and that Danny nonetheless exited. *Id.*, at 167. Upon exiting the bar, Mr. Wallick observed Danny approaching the defendant who was waving a knife and "hollering a bunch of stuff" that was threatening in nature *Id.*, at 169. Mr. Wallick testified that he saw Danny approach and the defendant back up before Danny caught up to the defendant and punch him. *Id.*, at 170. Mr. Wallick could not remember precisely, but he believed that Ms. Spangler attempted to break the fight up, that the police arrived, that Danny remained on scene, and that the defendant had left prior to the arrival of officers. *Ibid.*

10

The Commonwealth then called Ron Weagley who was the owner of Kiro's at the time of the events giving rise to this case. *Id.*, at 175. After the defendant had left with his wife "the first time," Ron was made aware that the defendant was groping women. *Id.*, at 177. The defendant later returned without his wife—whom Ron later discovered had been outside of the bar during the first incident between Danny and the defendant. *Ibid.* When Ron removed the defendant, the defendant paced outside for a while and was very upset and agitated. *Id.*, at 179. After the defendant had been cajoled into leaving the location, Ron returned to the bar and, at some later point, received a phone call from the defendant's wife stating that the defendant was returning to the bar with a knife. *Id.*, at 180-81. Ron took this to be a warning. *Id.*, at 182. Due to attending to a call he had placed to 911, Ron saw only portions of the events outside of the bar, but he described the defendant's demeanor as "[v]ery agitated, screaming." *Id.*, at 184-85. Of what he saw, Ron did not view the defendant as attempting to disengage or defuse the situation as he backed down the alley with his knife displayed and with Danny advancing. *Id.*, at 185. Pushed by the Commonwealth, Ron was unsure how to characterize the manner in which the defendant was holding the knife, but opined that "holding a knife out at somebody . . . I would say it's an aggressive manner." *Id.*, at 186.

Officer Noah Potteiger took the stand and testified that he was dispatched to Kiro's for a fight that had possibly involved a knife. *Id.*, at 198-99. Officer Potteiger spoke with Ms. Spangler, Ms. James, and Ms. Wallick who he testified were, despite two of them having

11

consumed alcohol, not intoxicated. *Id.*, at 201-03. Officer Potteiger believed their stories to have been consistent with one another. *Id.*, at 203.

Officer Andrew Miller took the stand and testified that he was dispatched to a fight call at Kiro's Tavern. *Id.*, at 213. Upon arrival, Ms. Spangler was observed to be holding a knife and pointing down 10th Avenue while proclaiming that a man running there had possessed the knife. *Id.*, at 214. Ms. Spangler dropped the knife when ordered to do so and the officer pursued and caught up to the individual who was walking briskly away from the scene. *Id.*, at 214-15. Upon apprehension at a residence, two knives were found on the defendant and a third was found under where he had been ordered to the ground. *Id.*, at 216. The defendant told the officer that he had left the bar with his wife after being punched by a man with a big black beard and that he was returning to the bar with knives to retrieve his wife whose safety he was in fear of. *Id.*, at 218-19. The officer later spoke with the defendant's wife inside of the residence. *Id.*, at 219. Though the officer had been speaking to the defendant on the porch of this residence, the officer did not observe the defendant's wife enter the residence in which she was found. *Id.*, at 219-20. Despite the defendant stating he had been attempting to retrieve his wife, the officer encountered the wife coming from the interior of the home, which led the officer to believe, to the best of his knowledge, that she had been at home. *Id.*, at 220. The defendant's wife told the officer that she had left the bar with the defendant. *Id.*, at 221. Nothing indicated to the officer that the defendant's wife had returned to the bar. *Id.*, at 221.

12

During their case in chief, the defense called the defendant's wife, Tara Moss. *Id.*, at 254-55. Ms. Moss testified that she and the defendant arrived at Kiro's between 9:00 and 9:30 p.m. Ms. Moss described a pleasurable evening spent with Breanne before Ms. Moss told the defendant to grab a six pack and to go home. *Id.*, at 255-56. This occurred around 1:00 a.m. and Ms. Moss continued that they then proceeded to her mother's home. *Id.*, at 256. Ms. Moss told the jury that, while home, she checked on the children during the time that the defendant indicated to her that he was going to go to the bathroom and have a cigarette. *Id.*, at 259. Thereafter, Ms. Moss was unable to locate the defendant. *Id.*, at 260. Figuring the defendant had returned to Kiro's, Ms. Moss decided to go to Kiro's around 1:20 a.m. Ms. Moss indicated that she found the defendant speaking to Ron about having been struck in the face. *Ibid.* Ms. Moss then stated that she and Ron convinced the defendant to return home while Ms. Moss stayed and talked to Ron for a couple of minutes. *Id.*, at 261. Ms. Moss then, according to her version of events, returned home again and was told by her daughter that the defendant had returned to Kiro's after stating that he had to retrieve "Mom." *Id.*, at 261-62. Ms. Moss testified that this was the point when she called Ron and told him that the defendant was on his way back to the bar and not to let him in. *Id.*, at 262.

During cross-examination, Ms. Moss testified that Breanne told her that the defendant was grabbing girls' butts, which angered Ms. Moss. *Id.*, at 265. When asked what else Breanne had told her, Ms. Moss replied: "Just pretty much what happened, that they got into a fight. **I don't really know the whole story. I wasn't there.**" *Ibid.* This point was later

13

reiterated by Ms. Moss. *Id.*, at 267. Ms. Moss further testified that she told Breanne that she saw the defendant leave the house with knives but that she had not actually seen this occur. *Ibid.* Ms. Moss offered that she only related to Ron that her daughter told her that she had seen the defendant grab *something*; but, that, she never told Ron that the defendant had a knife. *Id.*, at 266.

### III.   Matters Complained of on Appeal

#### A. Self-Defense

The Appellant's first matter complained of on appeal is that the Commonwealth failed to disprove the Appellant's claim of self-defense. We disagree.

Where a defendant has invoked self-defense as justification for his conduct, the Commonwealth bears the burden of disproving this defense beyond a reasonable doubt. *Commonwealth v. Torres*, 766 A.2d 342 (Pa. 2001); see also *Commonwealth v. Houser*, 18 A.3d 1128 (Pa. 2011). To raise the issue, there must be *some* evidence submitted before the Commonwealth need confront the assertion. *Torres, supra.* 18 Pa.C.S.A. § 505 provides that force may be justified to protect against the unlawful use of force by another person. Even if one is acting in justifiable self-defense, recklessly or negligently creating a risk of injury to innocent persons is disallowed. See *Commonwealth v. Fowlin*, 710 A.2d 1130 (Pa. 1998). Where non-deadly force threatens a defendant, the defendant's self-defense must not be excessive or else it is unreasonable. 18 Pa.C.S.A. § 505(b)(3); *Commonwealth v. Jones*, 332 A.2d 464 (Pa. Super. Ct. 1974); *Commonwealth v. Presogna*, 292 A.2d 476 (Pa. Super. Ct.

14

1972). The Commonwealth disproves self-defense beyond a reasonable doubt by accomplishing one of the following:

1. Demonstrating that the accused did not reasonably believe that he was in danger of death or serious bodily injury.

2. Demonstrating that the accused provoked the use of force.

3. Demonstrating that the accused had a duty to retreat and the retreat was possible with complete safety.

*Commonwealth v. McClain*, 587 A.2d 798, 801 (1991), appeal denied 598 A.2d 993 (Pa. 1991).

Turning to the case *sub judice*, The Appellant claimed, via his wife's testimony, that he returned to fetch her from an unsafe scenario. The jury clearly rejected this testimony, which conflicted with evidence offered that the Appellant's wife called the barkeep to warn him of the Appellant's return. The jury could only have believed that the Appellant was worried for his wife by rejecting the testimony of others that indicated that the Appellant left with his wife.

Per multiple witnesses, the Appellant returned to the bar with numerous knives after the initial altercation. The Appellant taunted Danny Leiphart, a willing interlocutor, into proceeding down to where the Appellant stood. The Appellant brandished a knife and stated that he did not wish to hurt Ms. Spangler, but that he did wish to hurt Danny. The Appellant seems to assert that any backwards momentum on his part demonstrates that he was retreating and defending himself. However, the jury may well have inferred from the

15

voluminous testimony of others that the defendant was simply attempting to get at Danny and was being forced backwards by the throng of persons involved. In fact, Danny testified that he was pushing the defendant back, which, if believed, does not demonstrate that the Appellant was retreating. Rather, the Appellant ignores the testimony, clearly credited by the jury, that both he and Danny were swinging at one another. The Commonwealth was able to demonstrate that the well-armed Appellant could not have reasonably believed he was at any real risk by virtue of his aggressive words and actions. The Appellant certainly provoked the use of force when multiple witnesses attested to his having taunted Danny upon Danny's exit from the bar. And any opportunity for the Appellant to retreat was rejected by an Appellant that, according to Ms. Wallick, was not attempting to deescalate the situation. The Commonwealth disproved the Appellant's claim of self-defense beyond a reasonable doubt and we therefore pray for affirmance as to this matter complained of on appeal.

B. Sufficiency of the Evidence

The Appellant's second matter complained of is that the evidence presented by the Commonwealth was insufficient. For the reasons cited *infra*, we disagree.

In *Commonwealth v. Fabian*, the Superior Court laid out their standard of review for sufficiency of the evidence challenges as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-

16

finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

60 A.3d 146, 150-51 (Pa. Super. Ct. 2013) (*Commonwealth v. Jones*, 886 A.2d 689, 704 (Pa. Super. Ct. 2005)).

### 1. *Possession of Instruments of a Crime*

Appellant was found guilty of possession of instruments of a crime under 18 Pa.C.S.A. § 907(a), which states in relevant parts:

**(a) Criminal instruments generally.**—A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.

The jury heard that the Appellant possessed multiple knives and that he brandished one whilst taunting Danny Leiphart, which satisfies the element of possession of an instrument of crime. The jury heard that the Appellant indicated that he did not wish to harm anyone save Danny. This is sufficient to demonstrate the Appellant's intent to use the knife to threaten and/or assault Danny, which would mean that the knife was employed criminally. The Commonwealth provided sufficient evidence to undergird the conviction of possession of instruments of a crime and we ask for affirmance as a result.

17

## 2. *Simple Assault*

The Appellant was convicted of simple assault, which is defined, in relevant part, as follows:

> (a) **Offense defined.**-- . . . a person is guilty of assault if he:
>
> > (3) Attempts by physical menace to put another in fear of imminent serious bodily injury[.]

18 Pa.C.S.A. § 2701(a)(3). The facts speak for themselves. The Appellant wielded knives. The jury heard that the Appellant stated that he did not wish to harm Breanne Spangler, but that he "just wanted [to] get Danny, he wanted to hurt Danny." (N.T., 3/12/18, at 77.) These facts were sufficient for a jury to include that the Appellant attempted, by physical menace, to put another in fear of imminent serious bodily injury. As such, we beg affirmance as to this matter complained of on appeal.

## 3. *Harrassment*

The Appellant was convicted of two counts of harassment, which are defined, in relevant part, as follows:

> (a) **Offense defined.**—A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:
>
> > (1) strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same[.]

The jury heard from Bridget James that the Appellant grabbed her buttock and she told him not to do so. Emily Wallick testified likewise that the Appellant had grabbed her buttocks. They were subjected to physical contact that was not desired. Whenever a person imposes

18

their unwanted will upon another then it is impossible to construe the perpetrator's intent as anything other than an intent to harass, annoy, or alarm. The elements of harassment were sufficiently made out by the Commonwealth and we would humbly request affirmance as a result.

### C. Trial by Surprise

The Appellant's third matter complained of is that the Commonwealth utilized evidence at trial that was not stated in the Information or Bill of Particulars. Arguing against the Commonwealth's assertion of waiver, the Appellant asserts that this claim attends his sufficiency of the evidence claim. Concise Statement of Matters Complained of On Appeal, at 8. To the extent that the Appellant is alleging insufficient evidence was adduced, we would note that we have already addressed this contention above. The Appellant was only tried on the charges listed in the Information. The Appellant alleges no evidenced was produced that fits the assertion in the information that he held a knife above his head. The Appellant ignores that the Commonwealth alleged in count 3 of the Information that "[t]he Actor attempted, by physical menace, to put Danny Leiphart, in fear of imminent serious bodily injury, by holding a knife over his head in a stabbing position **and/or** stating he was going to get victim." (emphasis added). The Information sufficiently put the Appellant on notice that the Commonwealth intended to introduce evidence that the Appellant had held a knife above his head in a stabbing position *or* that the Appellant had stated that he was going to get the victim. The jury did, in fact, hear that the Appellant told Breanne Spangler that he wanted to

19

get Danny. Even if a variance between the charging documents and the evidence presented exists, reversal is only required where the Appellant was prejudiced by the variance. *Commonwealth v. Delbridge*, 771 A.2d 1 (Pa. Super. Ct. 2001); *Commonwealth v. Cannady*, 590 A.2d 356 (Pa. Super. Ct. 1991). The Information charged and/or conduct and the Commonwealth presented evidence to support that the Appellant threatened Danny with a knife and that the Appellant was swinging a knife about. This Court sees no variance and no prejudice. As such, we dutifully request affirmance.

D. Right of Self-Representation

For his fourth matter complained of, the Appellant asserts that he was deprived of his right of self-representation. We disagree.

In the interest of expediting the Appellant's appeal, we would simply point to the record. Prior to the start of the first trial, which resulted in a mistrial, this Court attempted at length to colloquy the Appellant on his rights vis-à-vis self-representation. (Notes of Testimony, 3/7/18, at 1-23.) The Appellant knowingly and voluntarily waived his right to self-representation at trial. The Appellant was offered appellate counsel, which he seemingly accepted. (Notes of Testimony, 8/27/18, at 10.) The Appellant later rejected appellate counsel and this Court did not foist counsel on him. (Notes of Testimony, 9/24/18, at 1-4.) For support of the appropriateness of our actions in offering counsel to the defendant to act as an intermediary of sorts that the Court could better understand, we point to *Commonwealth v. Tighe*, 184 A.3d 560 (Pa. Super. Ct. 2018), which states, in part, "'logic . . . indicate[s] that

20

no absolute bar on standby counsel's unsolicited participation is appropriate or was intended.'" *Id.*, at 569 (citing *McKaskle v. Wiggins*, 465 U.S. 168, 176 (1984)). And,

> "[i]n determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way. *Faretta* itself dealt with the defendant's affirmative right to participate, not with the limits on standby counsel's additional involvement. The specific rights to make his voice heard that Wiggins was plainly accorded, form the core of a defendant's right of self-representation."

*Id.*, at 569-70 (quoting *Wiggins, supra*, at 177). So long as the Appellant's case was presented in its own way then we do not believe that the Appellant's right of self-representation was infringed. We believe that the Superior Court's review of the transcripts will demonstrate that the Appellant imposed his will at every step of the process and ably prosecuted his arguments. The appointment of Appellate counsel was merely to help this Court better engage the Appellant. We therefore pray for affirmance as to this matter complained of on appeal.

E. <u>Breanne Spangler's Bias</u>

The Appellant's fifth matter complained of on appeal is that this Court erred in denying his trial counsel the ability to effectively cross-examine Breanne Spangler and elicit Ms. Spangler's biases. We disagree.

When defense counsel attempted to ask Ms. Spangler whether she had wanted, at first, to avoid pressing charges, the following sidebar conversation occurred as a result of the Commonwealth's objection:

21

**Defense:** Your Honor, this would directly go to her - - this would directly go to her bias on why she's testifying here today. She changed her mind about pressing charges once her boyfriend or fiancé was charged.

**Cmwlth:** It was never her option to press charges or not. It's not that she could've said, well, I want [sic] to press charges and this case would've gone away.

**Defense:** I know, but she didn't want to cooperate or testify to what she testified to here today.

**Court:** I'm going to sustain the objection.

(N.T., 3/12/18, at 92-93.) The Appellant alleges that Ms. Spangler testified in order to curry favor for her fiancée and to avoid incarceration herself should she not testify. Concise Statement of Matters Complained of On Appeal, at 11. As to the latter allegation, the Appellant does not allege that Ms. Spangler was ever threatened with any penalty herself. Regarding Ms. Spangler's fiancée, Danny Leiphart, the jury heard that he had been charged with harassment and that he had pleaded guilty. On these facts, Ms. Spangler's testimony could not have garnered any leniency for her fiancée. While evidence of bias is generally admissible, "[t]he decision to permit or limit such examinations is a matter within the sound discretion of the trial court." *Commonwealth v. Murray*, 83 A.3d 137, 159 (Pa. 2013). We accept the Appellant's well-reasoned contention that evidence of bias is admissible; however, we reject its application in this case.

If the Superior Court were to disagree with our curtailing the defense's questioning of Ms. Spangler regarding any potential bias, then we would argue, in the alternative, that this

22

amounts to no more than harmless error. As was stated recently by our Supreme Court in *Commonwealth v. Brown*, harmless error exists in the following circumstances:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*;
>
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

185 A.3d 316, 330 (citing *Commonwealth v. Young*, 748 A.2d 166, 193 (Pa. 1999)). We believe that the properly admitted and uncontradicted evidence of guilt was overwhelming. *Multiple* witnesses testified regarding the Appellant being aggressive with a knife and threatening Danny Leiphart. Multiple Witnesses described how the Appellant returned to the bar with multiple knives and how the Appellant enticed Danny to meet him in the parking lot. Multiple witnesses described the scene as the Appellant was backed down the alley or was backing down the alley—yet multiple witnesses characterized the Appellant, whilst being reversed or reversing, as trying to get at Danny. The evidence was overwhelming. Admitting evidence of Ms. Spangler's bias would not have overcome the overwhelming evidence of the Appellant's assault on Danny Leiphart, the Appellant's possession of the knife utilized to threaten Mr. Leiphart, or the Appellant's harassment of two women earlier in the evening. For all of the above reasons, we request affirmance as to this matter complained of on appeal.

23

## F. Destroyed Evidence

For his sixth matter complained of on appeal, the Appellant argues that he was deprived of a fair trial when the Commonwealth destroyed video or audio evidence of a meeting it had with Devon Wallick. The Appellant correctly cited *Brady v. Maryland*, 373 U.S. 83 (1963) for the proposition that evidence favorable to the accused must be turned over to the defense upon request when it is material either to guilt or punishment. This has been codified in Pennsylvania and the rule can be found at: 42 Pa. C.S.A. § 9543. However, in order for this Court to have granted relief premised upon a *Brady* violation, we would have had to have been satisfied that the evidence "'could not have been obtained by reasonable diligence, that it is not cumulative or of such a nature that it merely impeaches credibility, and that it would likely compel a different result.'" *Commonwealth v. Lambert*, 765 A.2d 306, 324-25 (Pa. Super. Ct. 2000) (quoting *Commonwealth v. Carbone*, 707 A.2d 1145, 1148 n. 6 (Pa. Super. Ct. 1998) (citation omitted)). The Appellant in this case has made a bald assertion that such evidence existed and was exculpatory. The Commonwealth explained that their trial A.D.A., Matthew R. Swisher, Esquire, who was no longer with the York County District Attorney's Office, had been contacted and he had explained that there had been a recording made on his personal phone. (Notes of Testimony, 8/27/18, at 2-3). The Commonwealth asserted that the recording covered non-substantive issues and was utilized to arrange a follow-up interview with detectives, which resulted in the generation of a police report that was provided to defense counsel. *Id.*, at 3. This would not be exculpatory

24

evidence. Any exculpatory evidence would have been contained in the actual interview with detectives, which produced a report, which was turned over to the defense. For these reasons, we ask for affirmance as to this matter complained of on appeal.

### G. PCRA Claims

For his seventh matter complained of on appeal, the defendant argues that this Court erred in disallowing him to raise ineffective assistance of counsel claims under the Post-Conviction Relief Act (hereinafter: PCRA) during the direct review stage of his case. We disagree.

In *Commonwealth v. Grant*, the Supreme Court of Pennsylvania held that, "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." 813 A.2d 726, 738 (Pa. 2002). This is the general rule under which this Court decided not to hear the Appellant's PCRA claims. It was only in hindsight that we have identified *Commonwealth v. Holmes*, which reaffirmed the holding of *Grant* while simultaneously stating their trust that, "trial courts, in short sentence cases where a request is made to litigate collateral claims in the post-verdict scenario, will recognize these practical concerns and liberally allow for unitary review." 79 A.3d 562, 578 (Pa. 2013). Owing to the short remaining portion of the Appellant's sentence, in evaluating whether this Court erred, the issue becomes whether any of the Appellant's PCRA claims had a chance of succeeding. Thus, we turn to a recitation of basic PCRA law.

It is stated in *Strickland v. Washington* that, "the benchmark for judging any claim of

25

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. 668, 686 (1984). Pennsylvania codified this principle in the Post-Conviction Relief Act, which provides post-conviction relief for "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). Pennsylvania's Supreme Court has interpreted this to mean that to show ineffective assistance of counsel, a petitioner must show that:

> (1) the claim underlying the ineffectiveness claim has arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) counsel's actions resulted in prejudice to petitioner.

*Commonwealth v. Cox*, 983 A.2d 666, 678 (Pa. 2009) (citing *Commonwealth v. Collins*, 957 A.2d 237, 244 (Pa. 2008)); See also, *Commonwealth v. Rollins*, 738 A.2d 435, 441 (Pa. 1999) (citations omitted). "A chosen strategy will not be found to have lacked a reasonable basis unless it is proven 'that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.'" 983 A.2d 666, 678 (Pa. 2009) (quoting *Commonwealth v. Williams*, 899 A.2d 1060, 1064 (Pa. 2006) (quoting *Commonwealth v. Howard*, 719 A.2d 233, 237 (Pa. 1998))). In *Commonwealth v. Pierce*, the Pennsylvania Supreme Court wrote that, "[p]rejudice in the context of ineffective assistance of counsel means demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different." 786 A.2d 203, 213 (Pa. 2001) (citing

26

*Commonwealth v. Kimball*, 724 A.2d 326, 332 (Pa. 1999)), *abrogated on other grounds*, *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002); See also, *Commonwealth v. Fletcher*, 986 A.2d 759, 772 (Pa. 2009) (citations omitted). Lastly, "the law presumes that counsel was effective and the burden of proving that this presumption is false rests with the petitioner." 983 A.2d 666, 678 (Pa. 2009) (citing *Commonwealth v. Basemore*, 744 A.2d 717, 728 (Pa. 2000)). The law restated, we turn to the individual claims.

1. *False Statements by the Commonwealth During Opening Statements*

The Appellant opines that the Commonwealth made false statements during its opening statement that prejudiced the Appellant. Concise Statement of Matters Complained of on Appeal, at 15. First, the Appellant argues that as this Court found him not guilty of public drunkenness then it was false for the A.D.A. to label the Appellant as a drunk. The first prong of the test for ineffectiveness queries whether there is any arguable merit to the claim. *Commonwealth v. Cox*, 983 A.2d 666, 678 (Pa. 2009) (citation omitted). There is no arguable merit to this claim. All juries are informed that opening statements are not evidence. Whether or not the Appellant was in fact intoxicated has no bearing upon the charges that were being decided by the jury. Brittany Graves described the Appellant's behavior in a manner that evidenced his decline as he imbibed. (N.T., 3/12/18, at 99-100.) Danny Leiphart, described the Appellant as drunk. *Id.*, at 135. Just because the Court chose not to credit the testimony does not mean that the Commonwealth misled the jury in their opening statement. Moreover, the prosecutor, at the time of these remarks, was pursuing a public drunkenness

27

charge. It stands to reason that the Commonwealth believed that the evidence that would be adduced would bear out that charge. Additionally, the third prong of the test for ineffectiveness is also not met where there was no prejudice to the Appellant. As addressed *supra*, the Commonwealth presented sufficient evidence to convict the Appellant of the charges that the jury found him guilty of. Per *Pierce*, we cannot find that, but for any error on counsel's part in not objecting to the Commonwealth's opening, there was a reasonable probability of a different outcome to the proceeding. 786 A.2d, at 213. As the Appellant cannot meet two of the prongs of the test for ineffectiveness, the claim cannot succeed. Therefore, there would have been no merit to a hearing on this claim and we ask for affirmance.

Regarding the Appellant's second sub-claim, that the Commonwealth's opening misled the jury regarding the initial incident in which Danny Leiphart punched the Appellant, we are unsure as to exactly what the Appellant is claiming. Ms. Spangler testified that the Appellant's wife left without him and prior to the Appellant being punched by Danny Leiphart. This accords with the Commonwealth's opening statement. It is true that Danny Leiphart and Ron Weagley's testimony support the Appellant's contention that he left with his wife and returned without her prior to the first instance of fisticuffs. However, an objection by trial counsel would not have succeeded where the Commonwealth was allowed to tell the jury what evidence they believed that they would elicit and so there is no merit to the claim. *Cox, supra*. Moreover, the Appellant suffered no prejudice where the jury was

28

fully aware that Danny Leiphart had been charged and convicted for his conduct in punching the Appellant and where Danny Leiphart testified himself that he confronted the Appellant upon the Appellant's return. *Cox, supra.* This seems like nothing more than an instance in which *some* of the testimony slightly differed from the initial picture painted by the Commonwealth. It is a common occurrence in trials and not one for which we believe trial counsel could have been found ineffective. We pray for affirmance as to this matter.

## 2. *Solicitation of Known False Testimony*

Appellant believes his trial counsel was ineffective for failing to object to Officer Miller testifying that he had no indication, beyond the Appellant's statement to him, that the Appellant's wife had returned to the bar. Appellant submits that this is in direct contradiction of the testimony offered by Ron Weagley that the Appellant's wife was outside of the bar after the first incident. We see no contradiction. Mr. Weagley testified that he discovered that the Appellant's wife had been outside the bar during the initial incident. Unless we are wholly misunderstanding the Appellant's point, A.D.A. Swisher, in questioning Officer Miller, was seemingly referring to whether there was any evidence of the Appellant's wife having returned to the bar after having left with the Appellant. This could have encompassed Mr. Weagley's testimony that the Appellant *and his wife* were outside of the bar together after the first incident. Nothing in Mr. Weagley's testimony indicated that the Appellant's wife stayed behind after she and Mr. Weagley convinced the Appellant to go home. (N.T., 3/12/18, at 181.) From this, Officer Miller might have gleaned that the Appellant's wife did

29

not return to the bar after this point. It is only the Appellant's wife who indicated that she did not accompany her husband home after he had spoken to Ron Weagley. The Appellant's wife testified *after* Officer Miller. We see no merit to the claim. *Cox, supra*. The Appellant cannot meet the first prong of the test for ineffectiveness—a test in which all three prongs must be met. This PCRA claim would have failed and so we ask for affirmance.

### 3. *Use of Lies in Closing Arguments*

The Appellant alleges ineffectiveness in his counsel's failure to object to the Commonwealth attorney indicating that Ron Weagley testified that the Appellant and his wife left together after the first incident. In support of this, the Appellant cites to Ron Weagley testifying that he watched the Appellant proceed down the alley after the first incident. Concise Statement of Errors Complained of On Appeal, at 19. This elides the fact that Mr. Weagley, in the referenced section, was speaking of the Appellant and not of the location of the Appellant's wife. The jury was free to make inferences regarding the testimony and decide for themselves what actually happened. In *Commonwealth v. Koehler*, the Supreme Court of Pennsylvania stated the following regarding prosecutorial misconduct:

> [A] claim of ineffective assistance grounded in trial counsel's failure to object to a prosecutor's conduct may succeed when the petitioner demonstrates that the prosecutor's actions violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. The Touchstone is fairness of the trial, not the culpability of the prosecutor. Finally, **not every intemperate or improper remark mandates the granting of a new trial;** *reversible error*

30

*occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.*

36 A.3d 121, 144 (Pa. 2012) (internal citations and quotation marks omitted). We cannot find that the jurors would have been so prejudiced by this potential mischaracterization by the Commonwealth attorney as to have been unable to render a true verdict. The Appellant, then, cannot meet the third prong of the test for ineffectiveness outlined in *Cox, supra.* Counsel could not have been found ineffective on this matter and so the Appellant suffered no harm regarding his PCRA not having been heard on the matter. We request affirmance.

The Appellant also points to the Commonwealth attorney characterizing witness testimony as supporting a view that the Appellant was swinging knives and ranting and raving as an example of mischaracterization in his closing and to which defense counsel should have objected. As recounted in our facts section above, various witnesses testified that Ms. Spangler restrained Appellant's knife-wielding hand or the blade itself and that the Appellant was taunting Danny about the Appellant's new knife. We see no mischaracterization. There is neither merit to the claim, nor prejudice to the Appellant. We ask for affirmance as to this matter complained of on appeal.

*4. Prosecution Vouching for Commonwealth Witnesses*

The Appellant believes his counsel was ineffective for failing to object to the prosecution's argument to not be confused by defense arguments about Danny Leiphart being the actual aggressor. *Ab initio*, we believe the claim is waived for failure to develop it. Even

31

if it is sufficiently developed, there is no merit to this claim. *Cox, supra.* "A prosecutor 'has great discretion during closing argument' and is 'free [to present] his [or her closing] arguments with logical force and vigor.'" *Commonwealth v. Cash*, 137 A.3d 1262, 1273 (Pa. 2016) (quoting *Commonwealth v. Eichinger*, 108 A.3d 821, 836 (Pa. 2014)). And, "'[p]rosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair.'" *Ibid.* (quoting *Commonwealth v. Chmiel*, 30 A.3d 1111, 1146 (Pa. 2011). Additionally, the Commonwealth is permitted, in its closing, to confront the arguments of the defense. See *Commonwealth v. Miller*, 172 A.3d 632, 644 (Pa. Super. Ct. 2017). The Commonwealth was merely confronting the Appellant's justification defense. It is facially apparent that the Appellant cannot meet all three prongs of the test for ineffectiveness and this claim would have failed following a PCRA hearing. We seek affirmance as to this matter complained of.

### 5. *Jury Instructions*

The Appellant submits numerous allegations of trial counsel ineffectiveness for failing to garner the giving of instructions he wished the jury to have heard. We address them as succinctly as possible.

There is no merit to a claim that trial counsel was ineffective for not procuring an instruction on the right to bear arms. The right to bear arms does not bear upon a charge of simple assault. The right to bear arms does not grant a person the right to assault someone. There is no merit to the claim. Trial counsel was not ineffective for failing to obtain

32

instruction on this precept. The Appellant cannot meet at least one of the prongs of a test in which he must meet all three and so the PCRA claim would have failed anyway.

The Appellant was not prejudiced by trial counsel not requesting an instruction on justification—defense of others. For, even if counsel erred in failing to request a needed instruction, ineffectiveness will only be found where prejudice is also shown. See *Commonwealth v. Knight*, 611 A.2d 1199 (Pa. Super. Ct. 1992); *Commonwealth v. Potts*, 566 A.2d 287 (Pa. Super. Ct. 1989). The jury having heard that the Appellant was taunting Danny Leiphart about Appellant's new knife and making statements about wanting to hurt Danny and not Ms. Spangler, we cannot find that a different result would have occurred had the instruction been requested. The Appellant cannot meet at least one of the prongs of a test in which he must meet all three and so the PCRA claim would have failed anyway.

The Appellant was not prejudiced by his counsel's failure to request an instruction on use of force to protect property. As with his desired defense of others instruction, the force of evidence adduced to show that the Appellant wished simply to assault Danny Leiphart convinces this Court that the Appellant was not prejudiced. No different result would have occurred had the jury been instructed on the defense of property. Counsel was not ineffective on this charge. Moreover, though it is possible this Court has overlooked some evidence, we do not find evidence in the trial transcript regarding the Appellant having been robbed or needing to defend property. Thus, he likely would not have been entitled to an instruction on the defense of property. See *Commonwealth v. Butler*, 533 A.2d 992 (Pa. 1987). The

33

Appellant cannot meet at least one of the prongs of a test in which he must meet all three and so the PCRA claim would have failed anyway.

For the reasons already stated (i.e. the Appellant taunted Danny Leiphart and stated his desire to hurt Danny Leiphart), the Appellant's additional desired instructions on use of a device to protect property, use of force to pass a wrongful obstructer, and peace officer's use of force in making an arrest also necessarily fail. The Appellant simply was not prejudiced by any failure of his counsel to request his desired instructions where the overwhelming weight of the evidence demonstrated that the Appellant was spoiling for a fight with Danny Leiphart. Counsel's actions did not prejudice the Appellant and a PCRA hearing would not have developed any more useful evidence to support such a contention. We request affirmance as to these matters complained of on appeal.

### 6. Constructive Deprivation of Right to Counsel

The Appellant complains that his counsel did not file motions he wished to have been filed. It must be noted, that the Appellant complains of the actions of his first trial counsel, who was replaced following the mistrial. The Appellant ignores the ethical duty of lawyers not to burden courts with motions they deem frivolous. Moreover, the Appellant filed *numerous* pretrial motions *pro se*, which were addressed by this Court prior to trial. As addressed in our response to the Appellant's claim that he was deprived of his right to self-represent, the transcripts bear out that the Appellant sought at all times to avail himself of all of the advantages of counsel and of being *pro se*. His *pro se* motions were addressed by this

34

Court. Thus no prejudice accrued to the Appellant. The Appellant cannot meet at least one of the prongs of a test in which he must meet all three and so the PCRA claim would have failed anyway. We therefore humbly request affirmance on this matter.

The Appellant also complains that his first trial counsel admitted his guilt to certain crimes in contravention of the holding in *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018) (Holding in part that counsel could not cede defense of a charge without consent of the accused). We agree wholeheartedly with the Appellant. However, the rub is that Appellant's first trial ended in a mistrial. Any failures of his first trial counsel did not harm the Appellant on retrial. The Appellant has suffered no prejudice. The Appellant cannot meet at least one of the prongs of a test in which he must meet all three and so the PCRA claim would have failed anyway. We pray for affirmance as to this matter complained of on appeal.

### 7. *Preparedness of Counsel*

The Appellant argues that his trial counsel was ineffective as a result of the limited time that she and the Appellant spent in preparation together. We disagree.

To begin, we note that, at the conclusion of the mistrial, the following exchange occurred with Appellant's first trial counsel, whose firm supplied Appellant with retrial counsel:

Court: Well, I'm noting that you indicated yesterday there was an attorney prepared to take your place, so I'm kind of holding you to that.

Defense: Absolutely, Your Honor.

35

(Notes of Testimony, 3/7/18, at 146.) Moreover, the Appellant was aware, *at the time of trial*, of the issues he highlights as wishing to have discussed with his trial counsel—save for a lack of time. Though the Appellant alleges he did not have enough time to prepare with substitute counsel, the Appellant could have alerted counsel to these issues *during trial*. Finally, this complaint lacks merit where it contradicts, in part, the Appellant's earlier claim that this Court denied his right to self-representation. By his own complaints, the Appellant alleges that he was ready to steward his own case. It follows, then, that the Appellant was perfectly capable of aiding his trial counsel and informing her of areas that he wished her to delve into. Specifically, Appellant's allegation that his $100.00 bill and $200.00 Carhartt jacket were stolen at Kiro's could have easily been discussed with his counsel during the course of the trial and put to the test. Concise Statement of Matters Complained of On Appeal, at 25. The Appellant's allegation that his vehicle was parked at "T7S Trophies" is incongruent with the testimony of the Appellant's wife and Ron Weagley about the Appellant walking home after the first altercation when Danny Leiphart and his cohort were still inside Kiro's. *Ibid.* The Appellant does not allege that counsel was unwilling to hear him out; but, rather, that there was insufficient time with his trial counsel. This is patently false. There is no merit to this claim of ineffectiveness.

In addition to failing to meet the first prong of the test for ineffectiveness, the Appellant cannot meet the prejudice prong of the test for ineffectiveness. The overwhelming evidence, as illustrated in the fact section of this opinion, indicates that the Appellant was

36

taunting Danny Leiphart with a knife, was attempting to get at Danny, and proclaiming his desire to harm Danny. Moreover, the Appellant's wife called Ron Weagley to warn him that the Appellant was, depending on whose version of events is to be believed, returning with a knife or "something" and not to allow the Appellant entry to the bar. This evidences the Appellant's wife's state of mind regarding the Appelant's return to Kiro's. Additionally, the Appellant was carrying a kitchen drawers worth of knives. Though the Appellant is sure to argue that not all of the knives located were found on him, some knives were found on the Appellant and others were located along the Appellant's path of travel. As a typical person could defend themselves with, at most, two knives at one time, the jury could reasonably infer nefarious intent from the sheer number of knives the Appellant brought to an altercation in which no one testified that Danny Leiphart displayed any weaponry. The Appellant suffered no prejudice from lack of evidence being presented that he may have had some legitimate reasons to return to the bar. The Appellant's illegitimate reason was on full display for the jury. The Appellant cannot meet at least one of the prongs of a test in which he must meet all three and so the PCRA claim would have failed anyway. We hope for affirmance on this matter complained of on appeal.

### 8. *Selective Prosecution*

The Appellant next alleges that he is the victim of selective prosecution. For the following reasons, we disagree.

The Appellant alleges that this selective prosecution was evidenced by the following

37

testimony of Officer Andrew Miller:

> Cmwlth: So after you spoke with the Defendant, after you spoke with his wife, what happened next?
>
> Witness: After I was speaking with his wife, the - - one of my superior officers came down, notified me the extent of the investigation up on East 10th at North Court, advised me of possible charges, and at that point, we were instructed to transport Mr. Moss to central booking.

(N.T., 3/12/18, at 221.) The Appellant alludes to some vague accusation of impropriety premised upon the granddaughter of the mayor being one of the persons involved with speaking to police about his charges and the Appellant cites the above passage in support of that contention. Concise Statement of Matters Complained of On Appeal, at 27. In *Commonwealth v. Tanner*, our Superior Court outlined the test for establishing a *prima facie* case of selective prosecution:

> [A] defendant must establish, first, that others similarly situated were not prosecuted for similar conduct, **and**, second, that the Commonwealth's discriminatory prosecutorial selection was based on impermissible grounds such as race, religion, the exercise of some constitutional right, or any other such arbitrary classification. The burden is on the defense to establish the claim; it is error to shift the burden to the prosecution to establish or refute the claim. Because of the doctrine of separation of powers, the courts will not lightly interfere with an executive's decision of whom to prosecute.

--- A.3d --- (Pa. Super. Ct. 2019), 2019 WL 963243 (quoting *Commonwealth v. Murphy*, 795 A.2d 997, 1000 (Pa. Super. Ct. 2002)). We recall no testimony regarding the mayor, nor do we find mention of the mayor in the index of the trial transcript. We do not believe that additional testimony at a PCRA hearing would have been helpful on this point as the

38

Appellant's attendant accusation that he was the only person charged is patently false where Danny Leiphart was charged and pleaded guilty to harassment. That other wrongdoers might have escaped justice would be unfortunate but not, in our view, violative of the above-reproduced test. Another similarly situation person, Danny Leiphart, *was charged*. The Appellant was not charged with any theft-related charges. Ergo, any conduct by another along those grounds would not have been similarly situated to the Appellant. Moreover, having viewed footage of the initial altercation, within Kiro's, this Court was unable to determine if anyone else, besides Danny Leiphart, punched the Appellant. We suppose better or more attentive eyes might locate such activity; but, again, Danny Leiphart did face criminal charges. The officers made an independent decision to charge the Appellant that may well have reflected the severity of fisticuffs versus dangerous weapons.[7] As the Appellant cannot meet the first part of the test, in the name of judicial economy, we decline to analyze the second portion of the test. There is no merit to this claim. We hope for affirmance.

### H. Denial of Neurological/Head Trauma Expert

For his eighth matter complained of on appeal, the Appellant avers that this Court

---

[7] This Court is cognizant that we are not to cite unpublished cases or rely upon their holdings. See 210 Pa. Code § 65.37. Nonetheless, we may be guided by their persuasive analysis. The Appellant's case is somewhat like that of *Commonwealth v. Jones*, 2015 WL 6457983 (Pa. Super. Ct. 2015), which cites to published law. There, the defendant's actions were adjudged more culpable than those who were not charged. The *Jones* court recognized that "[t]he Commonwealth has the prerogative to recommend leniency in exchange for truthful testimony. *Id.*, at 3 (citing *Commonwealth v. Childress*, 799 A.2d 805 (Pa. Super. Ct. 2002). And, as was stated in *Commonwealth v. Tanner*, --- A.3d --- (Pa. Super. Ct. 2019), 2019 WL 963243, "[b]ecause of the doctrine of separation of powers, the courts will not lightly interfere with an executive's decision of whom to prosecute."

erred in denying his request for a neurological/head trauma expert. The Appellant believes that he was rendered incapable of possessing the requisite *mens rea* by virtue of a concussion. We disagree.

The crime of simple assault by physical menace[8] is a crime requiring specific intent. *Commonwealth v. Walker*, 139 A.3d 225, 234 (Pa. Super. Ct. 2016). Though the Appellant references "capacity," we are unclear if he is referring to the "diminished capacity defense," which is only available, in Pennsylvania, during the guilt phase, for a charge of first-degree murder. See *Commonwealth v. Garcia*, 479 A.2d 473 (Pa. 1984). Additionally, a diminished capacity defense is unavailable to a defendant who asserts his innocence—as the Appellant has. See *Commonwealth v. Williams*, 846 A.2d 105 (Pa. 2004). This issue aside, we start with the presumption that criminal defendants are sane. *Commonwealth v. Yasipour*, 957 A.2d 734, 738 (Pa. Super. Ct. 2008). Pennsylvania has rejected all standards, aside from the M'Naghten Rule, for determining legal insanity. See, e.g., *Commonwealth v. Zettlemoyer*, 454 A.2d 937 (Pa. 1982); *Commonwealth v. Weinstein*, 451 A.2d 1344 (Pa. 1982). Codified at 18 Pa.C.S.A. § 315, the M'Naghten Rule is applicable and enunciated as follows:

> **(a) General Rule.** –The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.
>
> **(b) Definition.** –For purposes of this section, the phrase **"legally insane"** means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to

---

[8] 18 Pa.C.S.A. § 2701(a)(3)

know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

See also *Commonwealth v. Woodhouse*, 164 A.2d 98 (Pa. 1960); *Commonwealth v. Andre*, 17 A.3d 951 (Pa. Super. Ct. 2011). As with diminished capacity, which we discussed *supra*, "[a] defense of insanity *acknowledges* commission of the act by the defendant, while maintaining the absence of legal culpability." *Commonwealth v. Smith*, 609 A.3d 873 (Pa. 2011) (citing, *inter alia*, *Commonwealth v. Hughes*, 865 A.2d 761, 788 (Pa. 2004) (citations omitted)) (emphasis added). The Appellant has steadfastly maintained that he did not act out the elements of the crimes charged—and he continues to do so on appeal. Per *Commonwealth v. Simms*, 324 A.2d 365 (Pa. Super. Ct. 1974), blows to the head may establish insanity; however, the Appellant would have had to of admitted that the acts occurred and could not be seeking to advance the inconsistent defenses that the elements of the crimes were not met *and* that he lacked capacity to be liable for them.

Owing a duty of candor to the courts and all parties, we do not deny that, upon the request of an indigent defendant, reasonable funds should be made available for a psychiatrist of the defendant's choice. See *Commonwealth v. Plank*, 478 A.2d 872 (Pa. Super. Ct. 1984). However, again, the Appellant did not acknowledge the commission of the acts alleged. Moreover, no evidence from any witness, nor even the defendant's wife, was adduced that the Appellant was acting out of sorts, unlike himself, or that the defendant was exhibiting neurological deficiencies. We do not find anywhere in the record where the Appellant has submitted medical records indicating that he suffered neurological damage as a result of Mr.

41

Leiphart's savagery. No doctor's note or treating records, nor even any evidence that the defendant sought out medical care following the incidents at Kiro's, were provided by the defendant to this Court. The Appellant made only a bald assertion without acknowledging the commission of the acts alleged. Trusting that if we have erred then our judicial betters will set us right, we request affirmance as to this matter complained of on appeal.

## I. Rule 600

For his ninth matter complained of on appeal, the Appellant alleges that this Court erred in denying his motion for dismissal of the charges based upon a breach by the Commonwealth of the Appellant's right to a speedy trial. We disagree.

In *Commonwealth v. Riley*, the Superior Court neatly summated the basics of Rule 600 as follows:

> Rule 600 provides, *inter alia*, that a defendant on bail is entitled to have trial commence no later than 365 days after the complaint date. When computing the number of pretrial days attributable to the Commonwealth under this rule, certain delays are excluded, such as those occasioned by defense postponements, by express defense waivers of Rule 600, by the unavailability of the defendant or defense counsel, and/or by the fact that the defendant could not be located and apprehended.

19 A.3d 1146, 1148-1149 (Pa. Super. Ct. 2011) (citing Pa.R.Crim.P. 600(A)(3) and Pa.R.Crim.P. 600(C)).

Even when the defendant's case has not been called for trial and the days subject to the delay appear to be attributable to the Commonwealth, a Rule 600 motion will not necessarily succeed. Such a motion should be denied if the Commonwealth demonstrated

42

due diligence in attempting to bring the defendant to trial *and* the circumstances necessitating the delay were beyond Commonwealth's control. *Riley*, 19 A.3d 1146, 1149 (Pa. Super. Ct. 2011) (citing *Commonwealth v. Frye*, 909 A.2d 853, 858 (Pa. Super. Ct. 2006) and Pa.R.Crim.P. 600(G)). This combination of due diligence and circumstances which are found to be beyond Commonwealth's control is referred to as "excusable time." *Commonwealth v. Frye*, 909 A.2d 853, 858 (Pa. Super Ct. 2006) (quoting *Commonwealth v. Hunt*, 858 A.2d 1234, 1241 (Pa. Super. Ct. 2004)).

From our review of case law, there is no simple definition of due diligence. Rather, "'[d]ue diligence is a fact-specific concept that must be determined on a case-by-case basis.'" *Commonwealth v. Hunt*, 858 A.2d 1234, 1241 (Pa. Super. Ct. 2004) (quoting *Commonwealth v. Hill*, 736 A.2d 578, 588 (Pa. 1999)). And, "'[d]ue diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a **reasonable** effort has been put forth.'" *Id*. at 1241-1242. (emphasis in original).

In *Commonwealth v. Hunt*, the Superior Court laid out instances in which "reasonable effort" was found, which included, "the Commonwealth listing the case for trial prior to the run date 'to ensure that [defendant] was brought to trial within the time prescribed by Rule [600].'" 858 A.2d at 1242 (quoting *Commonwealth v. Aaron*, 804 A.2d 39, 43-44 (Pa. Super. Ct. 2002). And reasonable effort has been found where the Commonwealth was ready to commence trial but was thwarted by an

43

administrative error that resulted in a trial date three days past the time limits provided by Rule 600. *Id.* (quoting *Commonwealth v. Wroten*, 451 A.2d 678, 681 (Pa. Super. Ct. 1982)). Yet, reasonable effort was not found where a district justice's staff incorrectly filed paperwork and Commonwealth, lacking a system to track case processing, only became aware that a defendant's case was in limbo as a result of defense counsel's inquiries. *Id.* (citing *Commonwealth v. McCutcheon*, 488 A.2d 281 (Pa. Super. Ct. 1985)).

The Appellant was charged on January 15, 2017, which means that the mechanical run date was January 15, 2018. During his tenure overseeing this case, our colleague, the Honorable Harry M. Ness, set trial to begin in the July term of court. (N.T., 8/3/18, at 37.) The July jury term in 2017 was from July 10th to July 21st. The Appellant's counsel at the time, seemingly, accepted a continuance to the September trial term, which began on September 5, 2017. *Ibid.* There is no indication on the record of the Appellant objecting to the continuance request of his counsel. Attorney Jefferis had filed a motion to continue the trial, docketed on July 5, 2017, due to his unavailability. Moreover, prior to the start of the first trial, Attorney Jefferis seemingly agreed that he had acquiesced that the time from the start of the July 2017 term to the start of the September 2017 term should run against the Appellant. (N.T., 3/7/18, at 22.) Thus, the time from July 10, 2017 to September 5, 2017, a total of 57 days, was attributable to the defense. Added to the mechanical run date the date by which trial needed to begin was March 13, 2018.

44

The June 21, 2017 Pre-Trial Order of Court, often referred to colloquially as clerk's notes, does not indicate against whom Judge Ness assessed Rule 600. The transcript does not reveal that Attorney Jason M. Jefferis was unavailable for all of the July term; but, rather, that there was an outstanding discovery issue. (Notes of Testimony, 6/21/17, at 2.) We believe that the determinant issue is Attorney Jefferis' written motion for a continuance evidencing his unavailability for the originally scheduled July 10, 2017 date, which indicates agreement by the Appellant. Additionally, this Court cannot determine from the record before it whether or not Attorney Jefferis might have been available during any portion of the July term of court. Relying on the record we had available, we made a Rule 600 decision. We humbly ask for affirmance as to this matter complained of on appeal.

## IV. Conclusion

Based upon the reasons stated above, this Court respectfully urges affirmance of the Order that was issued on August 27, 2018.

BY THE COURT,

DATED: April 26, 2018

MICHAEL E. BORTNER, JUDGE

45



**Don O'Shell
Clerk of Courts**

### In the York County Court of Common Pleas – Criminal Division

# R-U-S-H PROCESSING

*Use this form for documents that need to be RUSH processed within 24 hours.*

---

**R E Q U E S T O R**

### THIS SECTION MUST BE COMPLETED BY THE REQUESTOR
Present this form to Clerk of Courts Front Counter Clerk.

DATE: 4-26-19          Time: 2:00     AM (PM)

NAME of
Requestor: Sarah Smith

Representing
Office/Agency:_____

Requestor's Phone No.: _____

    Direct to- JUDGE_____

    Other _____

Client/
Defendant Name Graig Moss

    Case # CR-7471-2017

Purpose-Reason for RUSH Request:

NOTES-Special Instructions:

_____

**(circle) - Document Type**

BP - **Bail Piece**

EX - **Extradition**

ICC - **ICC Matters**

JV - **JV Commitment**

MPO - **Motion-Petition-Order**

TO - **Transport Order**

WR - **Warrant**

(OTHER) - Please List:

Opinion

---

### Front-End Batch Header Created – Front Counter

Created
By: _____  @ Time_____ am pm

### Hand - Delivered TO: Records Unit:

@ Time_____ am pm

Received &
Imaged By: _____ @ Time_____ am pm

---

### Received in Judicial Unit for Processing

_____
Processing Clerk

Action Performed:

Date: _____  Time:_____ am pm

**TIME STAMP WHEN RECEIVED AT C of C
FRONT COUNTER**

2019 APR 26 PM 2: 33
CLERK OF COURTS
YORK COUNTY JUDICIAL CENTER